**N.A.A.C.P., Boston Chapter,**
**Plaintiff, Appellant,**

**v.**

**SECRETARY OF HOUSING AND**
**URBAN DEVELOPMENT, et al.,**
**Defendants, Appellees.**

**No. 86–1111.**

United States Court of Appeals,
First Circuit.

Argued Dec. 4, 1986.
Decided March 19, 1987.

---

Natasha C. Lisman, with whom Edward J. Barshak, Sugarman, Rogers, Barshak & Cohen, P.C., Boston, Mass., Grover G. Hankins, General Counsel, Kansas City, Mo., and Rachel S. Susz, Asst. Gen. Counsel, were on brief for plaintiff, appellant.

Howard S. Scher, Dept. of Justice, with whom Anthony J. Steinmeyer, Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., William F. Weld, U.S. Atty., Boston, Mass., Gershon M. Ratner, Associate Gen. Counsel for Litigation, Howard M. Schmeltzer, Sp. Asst. to the Associate Gen. Counsel for Litigation, and Anthony J. Ciccone, Jr., Washington, D.C., were on brief for defendants, appellees.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

The Federal Fair Housing Act (Title VIII of the Civil Rights Act of 1968) declares as its "policy" the provision of "fair housing throughout the United States." 42 U.S.C. § 3601. Its substantive provisions prohibit discrimination related to the rental or sale of places of dwelling. 42 U.S.C. §§ 3604–3606. In addition, it instructs the Secretary of Housing and Urban Development to

administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this [Fair Housing Act]....

42 U.S.C. § 3608(e)(5). The specific question raised in this appeal is whether federal courts have the legal authority to review claims that the Secretary has failed to carry out this last instruction. The district court believed that, at least where the Secretary has not acted with a discriminatory purpose, the Secretary's compliance with § 3608(e)(5) is a matter that Congress has "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Accordingly, it held that it could not legally review the appellant's claims of violation and it dismissed the case. We believe, however, that the court has the power to review appellant's claim that the Secretary has not "administer[ed]" certain HUD programs "in a manner affirmatively to further" the Act's basic policy. Hence, we reverse the district court's dismissal and remand the case for further proceedings.

### I

### *Background*

Nearly nine years ago, in April 1978, the NAACP sued the Secretary and other officials of the Department of Housing and Urban Development (collectively "HUD"), claiming that HUD had failed "to enforce constitutional and statutory proscriptions against discrimination in Federally-assisted programs." Its complaint listed various acts and omissions related to HUD's administration of its Community Development Block Grant (CDBG) and Urban Development Action Grant (UDAG) programs in the City of Boston, which acts and omissions, it said, taken together, established violations of various civil rights statutes, including HUD's duty "affirmatively to further" the Fair Housing Act's policies.

In 1983, the district court after trial found, as factual matters, that Boston has a history of racial discrimination in housing; that Boston suffers from a shortage of low-income family housing; that a higher proportion of black than white families are renters and a higher proportion of black than white renters are families with children (and thus that the housing shortage impacts more heavily on blacks than on whites); that Boston's neighborhoods are racially separate; and that "at least in part [as] the result of the lack of safe, desegregated housing in white neighborhoods" black families find it difficult to move out of black areas. *NAACP v. Harris,* 567 F.Supp. 637, 640–41 (D.Mass.1983). The court also found that both city and federal officials were aware of these facts; that the city had not effectively enforced fair housing requirements; that neither the city nor HUD had sought to obtain or to provide UDAG funds for low-income housing; and that HUD had not obtained from the city the assessment of "any special needs of identifiable segments of the lower income population" that HUD regulations then required. *Id.* at 641–43.

In the court's view, these facts added up both to a violation of HUD's "minority housing needs" regulation and to a violation of HUD's Title VIII duty "affirmatively to further" the Act's policy. In particular, it wrote that HUD's failure to use its "immense leverage under UDAG" to provide "desegregated housing so that the housing stock is sufficiently large to give minority families a true choice of location," in the context of Boston's history and practices, violated HUD's Title VIII obligations. *Id.* at 644.

In late 1985, after the parties had submitted proposed forms of judgment, the district court decided that it could not enter an order granting relief from the legal

violations that it had found. The court noted that in 1982 HUD had obtained from the city an acceptable "minority needs assessment," and held that HUD had thereby cured the violation of its own regulations, rendering further relief inappropriate. *NAACP v. Pierce,* 624 F.Supp. 1083, 1085 (D.Mass.1985). The court also determined that it could not grant relief from the Title VIII violation because it did not have the legal authority to review the Secretary's compliance with the "affirmative furtherance" mandate. *Id.* at 1086–93. It held that Congress had not created any "private right of action" to enforce Title VIII's legal obligation, and that it could not review the Secretary's actions under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.,* because Congress had "committed" compliance with the obligation "to agency discretion," 5 U.S.C. § 701(a)(2). The court accordingly dismissed the NAACP's claims. The NAACP now appeals this dismissal.

## II

### Private Right of Action

■ The NAACP argues that the district court's dismissal of its case is wrong because Congress, in enacting Title VIII, implicitly created a "private right of action" allowing it to enforce "directly" the obligations that Title VIII imposes upon the federal government. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The short, conclusive answer to this argument, however, is that this court has recently held that Congress did not create any such direct private cause of action under Title VIII. *Latinos Unidos de Chelsea en Accion v. Secretary of Housing and Urban Development,* 799 F.2d 774, 791–93 (1st Cir.1986).

In fact, it is difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the *federal* government, for there is hardly ever any need for Congress to do so. That is because federal action is nearly always reviewable for conformity with statutory obligations without any such "private right of action." *See*

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) ("judicial review of a final agency action ... will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress"); *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 110, 23 S.Ct. 33, 39, 47 L.Ed. 90 (1902) (where agency makes "a clear mistake of law ... the courts ... must have power in a proper proceeding to grant relief"); 5 K. Davis, *Administrative Law Treatise* § 28.1, at 254–56 (1984); L. Jaffe, *Judicial Control of Administrative Action* 339–53 (1965). This "presumption" of judicial reviewability, now codified in the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.,* applies not only to "[a]gency action made reviewable by statute," but also to any other "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. Any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, may ask a court to "set aside agency action ... not in accordance with law" or to "compel agency action unlawfully withheld," 5 U.S.C. § 706.

Given these (and related) principles of administrative law, as set forth in the APA, it is not surprising that cases discussing a "private right of action" implied from a federal statute do not involve a right of action against the federal government. Rather, they typically involve statutes that impose obligations upon a *nonfederal person* (a private entity or a nonfederal agency of government). The statute typically provides that the federal government will enforce the obligations against the nonfederal person. The "private right of action" issue is whether Congress meant to give an injured person a right himself to enforce the federal statute directly against the nonfederal person or whether the injured person can do no more than ask the federal government to enforce the statute. *See, e.g., California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (finding no private right of action to enforce Section 10 of the Rivers and Harbors Appropriation Act of 1899 against a state); *Cannon v. University of Chicago,* 441 U.S.

677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (finding private right of action to enforce Title IX of the Education Amendments of 1972 against private university); *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (finding no private right of action in shareholder to enforce 18 U.S.C. § 610 against corporation). *Cort v. Ash,* the leading case on the subject, simply lays down a set of rules to help the courts determine what Congress intended when the statute itself is silent.

One can imagine a few instances in which a court might, notwithstanding the APA, wonder whether Congress meant to create a private right of action against the federal government. The APA, for example, does not award attorney's fees to a successful litigant. *But see* 28 U.S.C. § 2412(b) (authorizing award of attorney's fees against the United States "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award"). Yet, a particular statute might provide for attorney's fees for successful private enforcement of its obligations. A court might then have to decide whether a private party who enforces the statute against the federal government also is entitled to attorney's fees, thus requiring the court to determine whether the action arises under the *particular* act or whether it is simply a general APA-based request for judicial review. *Cf. Natural Resources Defense Council v. EPA,* 484 F.2d 1331 (1st Cir.1973) (holding that suit against the government under § 307 of the Clean Air Amendments of 1970 was effectively an "action brought pursuant to" § 304(a) of that Act, and that successful plaintiff was therefore eligible for attorney's fees); *see also Cannon v. University of Chicago,* 441 U.S. at 699–701, 99 S.Ct. at 1958–60 (citing explicit authorization of attorney's fee award against federal government in certain actions to enforce Title VI of the Civil Rights Act of 1964 as support for conclusion that Title VI confers a private right of action). Alternatively, a court might have to decide whether Congress implicitly means a statute to provide a party with a "private right of

action" against one of the few federal bodies exempted from the APA's coverage. *See* 5 U.S.C. § 701(b)(1) (exempting, *inter alia,* Congress, federal courts, territorial and District of Columbia governments, and certain military bodies). In other special circumstances, it might have to decide whether Congress implicitly means a statute to confer a private right of action that differs in its procedural contours from the review that the APA typically provides. *See* 5 U.S.C. § 704 (ordinarily requiring exhaustion of administrative remedies before invoking APA). One would ordinarily expect, however, that when Congress means to permit a private party to ask a court to review the legality of federal actions in a manner that differs from APA review, Congress will say so explicitly in the statute. *See, e.g.,* 29 U.S.C. § 160(e), (f) (setting forth provisions for review of NLRB orders). Otherwise, it is reasonable to assume that Congress meant the APA to govern.

Of course, we recognize that to apply the APA will mean no review if (to use the APA's language) "statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). But this fact creates no anomaly, for it would be a self-contradiction for a court to find both (1) that one of these exceptions applies and (2) that Congress nonetheless intended to grant a private right of action permitting review.

We note that in those few cases in which courts have spoken of inferring a "private right of action" against the federal government, the courts have not considered the role of the Administrative Procedure Act. *See, e.g., Young v. Pierce,* 544 F.Supp. 1010, 1017–19 (E.D.Tex.1982) (finding a private right of action under Title VIII). Had they done so, they might have found the discussion of "private right of action" unnecessary. *See Munoz-Mendoza v. Pierce,* 711 F.2d 421, 429 (1st Cir.1983) (suggesting that district court on remand consider civil rights action as arising under APA rather than under direct private right of action). Regardless, no special circumstance exists in this case, or under Title VIII, that would

call for other than APA review. Hence, we affirm our holding that Congress intended no special private right of action against the federal government.

## III

### *The Substantive Claim*

■ Before turning to the question of APA reviewability, we consider the government's argument that we should affirm the court's decision on an alternative ground. The government argues that § 3608(e)(5) imposes upon HUD only an obligation not to discriminate. It says that

HUD's actions violate its obligations under Title VIII *only* when HUD engages in discriminatory conduct or when it funds a grantee who is engaged in such discriminatory conduct with the purpose of furthering the grantee's discrimination.

Brief for Appellee at 19 (emphasis in original). Since the district court found neither actual discrimination by HUD nor an effort purposely to further the discrimination of others, 567 F.Supp. at 643–44, HUD, in the government's view, could not have violated § 3608(e)(5).

We do not agree that HUD's Title VIII obligations are as limited as the government claims. Rather, a statute that instructs HUD to administer its grant programs so as "affirmatively to further" the Act's fair housing policy requires something more of HUD than simply to refrain from discriminating itself or purposely aiding the discrimination of others. For one thing, as the government states its Title VIII obligation, it sounds very much like (and perhaps even less than) the obligation that the Fifth Amendment would impose upon HUD even in the absence of Title VIII. *See Washington v. Davis*, 426 U.S. 229, 239–45, 96 S.Ct. 2040, 2047–50, 48 L.Ed.2d 597 (1976); *Norwood v. Harrison*, 413 U.S. 455, 463–68, 93 S.Ct. 2804, 2809–12, 37 L.Ed.2d 723 (1973); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *National Black Police Association v. Velde*, 712 F.2d 569, 580–83 (D.C. Cir.1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); *Clients'*

*Council v. Pierce*, 711 F.2d 1406, 1409–23 (8th Cir.1983). Yet, the history of Title VIII suggests that its framers meant to do more than simply restate HUD's existing legal obligations. *See* 114 Cong.Rec. 2281 (1968) (statement of Sen. Brooke) (a purpose of Title VIII is to remedy the "weak intentions" that have led to the federal government's "sanctioning discrimination in housing throughout this Nation"); *id.* at 2526–28 (statement of Sen. Brooke) (reviewing history of federal fair housing efforts); *id.* at 9577 (statement of Rep. Cohelan) (decrying historical "neglect" of minorities); *id.* at 9595 (statement of Rep. Pepper) (lamenting government's slowness in establishing truly "equal" rights); *see also Clients' Council v. Pierce*, 711 F.2d at 1425 (holding that even if facts do not establish constitutional violation by HUD, they still establish violation of affirmative duty under Title VIII).

For another thing, as a matter of language and of logic, a statute that instructs an agency "affirmatively to further" a national policy of nondiscrimination would seem to impose an obligation to do more than simply not discriminate itself. If one assumes that many private persons and local governments have practiced discrimination for many years and that at least some of them might be tempted to continue to discriminate even though forbidden to do so by law, it is difficult to see how HUD's own nondiscrimination by itself could significantly "further" the ending of such discrimination by others.

Further, the legislative history does not support so constricted a reading of the statute. It is true that the sponsors of the law, including Senator Mondale, its chief sponsor, made absolutely clear that Title VIII's policy to "provide ... for fair housing" means "the elimination of discrimination in the sale or rental of housing. That is all it could possibly mean." 114 Cong. Rec. 4975; *see also id.* at 2279 (statement of Sen. Brooke) (Title VIII "does not promise to end the ghetto ... but it will make it possible for those who have the resources to escape"); *id.* at 9589 (statement of Rep. Halpern) (Title VIII guarantees blacks the

right to live "where [they] wish[ ] ... and where [they] can afford"); *id.* at 9597 (statement of Rep. Brown) ("sense" of Title VIII is "a rather nebulous support of civil rights and opposition to the last vestige of white supremacy or exclusivity as it has been exercised in housing"). But it is equally true that the law's supporters saw the ending of discrimination as a means toward truly opening the nation's housing stock to persons of every race and creed. *See* 114 Cong.Rec. 2274 (statement of Sen. Mondale) (Title VIII is "an absolutely essential first step" toward reversing the trend toward "two separate Americas constantly at war with one another"); *id.* at 2524 (statement of Sen. Brooke) ("Discrimination in the sale and rental of housing has been the root cause of the widespread patterns of de facto segregation which characterize America's residential neighborhoods."); *id.* at 2985 (statement of Sen. Proxmire) (Title VIII will establish "a policy of dispersal through open housing ... look[ing] to the eventual dissolution of the ghetto and the construction of low and moderate income housing in the suburbs"). This broader goal suggests an intent that HUD do more than simply not discriminate itself; it reflects the desire to have HUD use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases. This view of the effect that Congress intended is at odds with the government's very narrow view of its obligation.

Finally, every court that has considered the question has held or stated that Title VIII imposes upon HUD an obligation to do more than simply refrain from discriminating (and from purposely aiding discrimination by others). Thus, in *Shannon v. Department of Housing and Urban Development*, 436 F.2d 809 (3d Cir.1970), the court ordered a remand of HUD's approval of a change in the nature of an urban renewal project so that HUD could consider whether this change would lead to increased minority concentration in the inner city and thus promote, rather than diminish, ghettoization. In *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir.1973), the Second Circuit held that, under Title VIII, "[a]ction must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." Accordingly, the court held that a Housing Authority might even ignore its own regulations giving assignment priority in urban redevelopment projects to former site residents if it is convinced that doing so is the only way to prevent ghettoization of the area. *See also Alschuler v. Department of Housing and Urban Development*, 686 F.2d 472, 482 (7th Cir. 1982); *Garrett v. City of Hamtramck*, 503 F.2d 1236, 1246–47 (6th Cir.1974); *King v. Harris*, 464 F.Supp. 827, 837–44 (E.D.N.Y.), *aff'd without opinion sub nom. King v. Faymor Development Co.*, 614 F.2d 1288 (2d Cir.1979), *vacated on other grounds*, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980); *Resident Advisory Board v. Rizzo*, 425 F.Supp. 987, 1013–24 (E.D.Pa.1976), *aff'd in substantial part on other grounds*, 564 F.2d 126 (3d Cir.1977), *cert. denied sub nom. Whitman Area Improvement Council v. Resident Advisory Board*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978) (reaching similar conclusions). Furthermore, the Supreme Court itself has identified the goal of Title VIII as "replace[ment of] ghettos 'by truly integrated and balanced living patterns.'" *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972) (quoting 114 Cong.Rec. 3422 (statement of Sen. Mondale)); *see also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (upholding standing under Title VIII where plaintiffs' only claim of injury was denial of the benefits of an integrated community); *Linmark Associates v. Township of Willingboro*, 431 U.S. 85, 95, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977) (characterizing Title VIII as "a strong national commitment to promote integrated housing"). We see no reason to contradict the consensus opinion set out in these many cases.

The government relies upon a recent Eleventh Circuit case, *Anderson v. City of Alpharetta,* 737 F.2d 1530 (11th Cir.1984), as support for its narrow view of HUD's duties. In *Anderson,* a class of plaintiffs sued HUD, claiming that HUD had illegally failed to counteract "the deliberate foot-dragging of local governments" in constructing low-income public housing, which local delay the plaintiffs said was racially motivated. The Eleventh Circuit, in affirming dismissal for failure to state a claim, wrote that HUD itself is liable under Title VIII only

> first, when HUD has taken discriminatory action itself, such as approving federal assistance for a public housing project without considering its effect on the racial and socio-economic composition of the surrounding area; and second, when HUD is aware of a grantee's discriminatory practices and has made no effort to force it into compliance with the Fair Housing Act by cutting off existing federal financial assistance to the agency in question.

737 F.2d at 1537 (citations omitted). This formulation, even if overly narrow, still does not support the government's view of HUD's duties. It does not limit HUD's liability to *purposive* support of discrimination by others, nor does it limit HUD's "discriminatory action" to activity that itself forecloses housing opportunities on the basis of race. Rather, it includes within the scope of such action a failure to "consider [the] effect [of a HUD grant] on the racial and socio-economic composition of the surrounding area." And, the need for such consideration itself implies, at a minimum, an obligation to assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase that supply. If HUD is doing so in any meaningful way, one would expect to see, over time, if not in any individual case, HUD activity that tends to increase, or at least, that does not significantly diminish, the supply of open housing.

Having concluded that HUD's obligations under Title VIII extend beyond what the government claims, we must reject its request that we affirm the judgment below on the ground that HUD has not violated any legal obligation. The district court's opinions state a plausible case of a violation of HUD's obligations, even under the minimal standard set forth in the last paragraph. The district court stated, *inter alia:*

1) In the case of the City of Boston ... [HUD's] efforts to ensure fair housing have been ineffective. It has accepted from the City cosmetic changes in the form of a Mayor's Office of Fair Housing and some public relations efforts instead of genuine enforcement.

567 F.Supp. at 644.

2) [I]t had not required the City to establish an effective fair housing program in the face of knowledge of pervasive racial discrimination in the City.

624 F.Supp. at 1085.

3) The financing of desegregated housing so that the housing stock is sufficiently large to give minority families a true choice of location seems ... to be a[n] ... obligation of HUD under ... Title VIII.

567 F.Supp. at 644.

4) [HUD] has not used any of its immense leverage under UDAG to provide adequate desegregated housing, except for Mission Park, which was not a project sponsored by the City.

*Id.*

These, and other roughly similar statements in the court's opinions, read as if the court had more in mind than a crude legal standard requiring HUD to provide housing for all those in need. We agree that HUD has no such obligation. *See* 114 Cong.Rec. 4975 (statement of Sen. Mondale) (policy "to provide ... for fair housing" is not a mandate to "provide housing" but only to "eliminate discrimination in the sale or rental of housing"); *see also Jaimes v. Toledo Metropolitan Housing Authority,* 758 F.2d 1086, 1103–04 (6th Cir. 1985); *Anderson v. City of Alpharetta,*

*supra; Acevedo v. Nassau County,* 500 F.2d 1078, 1082 (2d Cir.1974). Rather, the court's statements read like an affirmative response to a claim that HUD's pattern of grant activity in Boston reflects a failure, over time, to take seriously its minimal Title VIII obligation to evaluate alternative courses of action in light of their effect upon open housing.

Whether the district court's findings are adequately supported by the evidence, whether in context they make out a violation of law, whether and to what extent Title VIII obliges HUD to do even more than the minimum that we have stated in this opinion, all are legal questions that we do not—and indeed cannot—decide on this appeal. They are not squarely presented by the case in its present posture and the parties have not argued them. Given the nature of the record and the parties' arguments here, we find only the existence of a plausible claim of a Title VIII violation. We therefore decline the government's invitation to affirm on the alternative ground that HUD engaged only in legally permissible behavior.

## IV

### *Reviewability Under the APA*

■ We now turn to the basic issue in this case. Is a claim of a Title VIII violation *of the sort at issue here* reviewable under the APA? The district court, while believing that HUD had acted unlawfully, found that it lacked the power to review and to correct that unlawful behavior. It noted that the APA qualifies the broad presumption in favor of judicial review of agency action, *see Abbott Laboratories v. Gardner,* 387 U.S. at 140–41, 87 S.Ct. at 1510–11, with two exceptions. A court cannot review an agency's activities "to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The first of these exceptions clearly does not apply here. The district court, however, found the second exception applicable.

Clearly, HUD possesses broad discretionary powers to develop, award, and administer its grants and to decide the degree to which they can be shaped to help achieve Title VIII's goals. This fact, however, does not in itself mean that HUD is immune from review for "abuse of discretion" in exercising those powers. 5 U.S.C. § 706(2)(A). Rather, it simply means that a court is less likely to find against the agency, for the agency is less likely to have acted unlawfully. *See Dugan v. Ramsay,* 727 F.2d 192, 195 (1st Cir.1984); 5 K. Davis, *Administrative Law Treatise* § 28.-5, at 271 ("the key question is not *whether* agency action is committed to agency discretion by law, but *the extent that* it is so committed") (emphasis in original); Berger, *Administrative Arbitrariness and Judicial Review,* 65 Colum.L.Rev. 55 (1965).

In order for § 701(a)(2) to apply, the matter must be one that a court cannot review even to determine whether the agency, exceeding the scope of its broad power, acted *unlawfully.* Such cases are few, and typically involve areas where the very act of reviewing may impede the agency's ability to carry out its statutory functions. *See, e.g., Chicago & Southern Air Lines v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (disposition of applications for certificates for overseas or foreign air transportation); *Braniff Airways v. CAB,* 581 F.2d 846 (D.C.Cir. 1978) (same); *Langevin v. Chenango Court,* 447 F.2d 296, 302–04 (2d Cir.1971) (FHA decision to permit rent increase in federally assisted housing); *Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir.1970) (same); *see generally Dugan v. Ramsay,* 727 F.2d at 195. Thus, here, the question is whether Congress intended, or needed, in order to prevent unwarranted judicial interference with HUD's efforts to carry out its various statutory activities, to preclude review of whether HUD's pattern of behavior exceeds its fairly broad range of discretionary choice.

We believe that preclusion is inappropriate here for the following reasons. First, the right at issue—the right to HUD's help in achieving open housing—is a significant one. The congressional debates leave no doubt that Congress thought it important.

*See* 114 Cong.Rec. 2275 (statement of Sen. Mondale) ("fair housing is a key and indispensable part of any solution of the interracial problems of our country"); *id.* at 2703 (statement of Sen. Javits) (terming fair housing "more important than jobs, and even more important than equal treatment under the law"); *id.* at 2986–91 (statement of Sen. Brooke) (ghetto is a root cause of other social problems); *id.* at 9616 (statement of Rep. McCormack) ("[W]e must turn our face away from a course of segregation and separation."). And, it seems reasonable to believe that plaintiffs wrongly deprived of that assistance over a course of time might require judicial intervention to obtain it. *Cf. Hahn v. Gottlieb*, 430 F.2d at 1250 (considering, in denying review of FHA decision to permit rent increase, fact that "plaintiffs' interests are not threatened by every rent increase, and other forms of relief ... are available"). Under all the circumstances of this case, the facts found by the district court (if true) strongly suggest a political process that has failed to offer plaintiffs adequate alternative relief.

Second, we believe that the court can find adequate standards against which to judge the lawfulness of HUD's conduct. This is a case in which plaintiffs, in effect, claim that HUD's practice over time, its *pattern* of behavior, reveals a failure "affirmatively ... to further" Title VIII's fair housing policy. The NAACP does not complain of individual instances so much as it *uses* individual instances to show a pattern of activity, which pattern constitutes the alleged violation. Thus, we need not decide how, or whether, a court can fashion standards governing when, or the extent to which, HUD should use an *individual* grant decision affirmatively to bring about desegregation. Nor need we consider how a court is to review whether HUD in an individual instance has given appropriate weight to its UDAG mission "to make ... grants to cities ... experiencing severe economic distress to help stimulate economic development activity," 42 U.S.C. § 5318(a), to its Title VIII objectives, and to various other factors such as the importance of the case, the likelihood of success in achieving HUD's various goals, and the availability of resources. *Cf. Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (holding unreviewable an FDA decision not to investigate a *particular* alleged violation, as the law authorizing investigations offered no standard for separating lawful from unlawful investigatory decisions); *Hahn v. Gottlieb*, 430 F.2d at 1249–50 (citing difficulty of finding a standard for reviewing individual decisions to permit rent increases).

Rather, here the court must decide whether, over time, HUD's pattern of activity reveals a failure to live up to its obligation. The standard for reviewing that pattern can be drawn directly from the statutory instruction to "administer" its programs "in a manner affirmatively to further the policies" of "fair housing." 42 U.S.C. §§ 3608(e)(5), 3601. This standard, like many, may be difficult to apply to borderline instances, yet a court should be able to determine a clear failure to live up to the instruction over time. It should be able to determine whether the agency's practice, over time, in respect to this mandate has been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Doing so, in the context of a claim of serious failure over time to try to further Title VIII's goals, need not involve the court in "superintend[ing] economic and managerial decisions," *Hahn v. Gottlieb*, 430 F.2d at 1249, or in reweighing matters that Congress has asked HUD to balance. Rather, this case seems to call for a more straightforward evaluation of whether agency activity over time has furthered the statutory goal, and, if not, for an explanation of why not and a determination of whether a given explanation, in light of the statute, is satisfactory. *See* 5 K. Davis, *Administrative Law Treatise* § 28.7, at 283 ("Courts that are unqualified to exercise particular discretion are often ... qualified to determine whether that discretion has been abused."). Such a case, obviously, is not easy to try, or to decide. Yet, we do not see how, or why, it is any more difficult than other civil rights cases

in which courts have judged the lawfulness of agency behavior against roughly analogous standards. *See Adams v. Richardson*, 480 F.2d 1159, 1161–63 (D.C.Cir.1973) (upholding action against HEW for failure to enforce antidiscrimination provisions of Title VI); *see also Iowa v. Block*, 771 F.2d 347, 349–52 (8th Cir.1985) (permitting review of Secretary of Agriculture's failure to implement discretionary disaster relief programs), *cert. denied sub nom. Iowa v. Lyng*, —— U.S. ——, 106 S.Ct. 3312, 3313, 92 L.Ed.2d 725 (1986); *California Human Development Corp. v. Brock*, 762 F.2d 1044, 1048 n. 28 (D.C.Cir.1985) (statute permitting Secretary of Labor to disburse funds either on a case-by-case basis or according to a formula provides sufficient standards for review of reasonableness of formula even if court could not review case-by-case determinations). Nor does it seem different, in principle, from ˈother cases in which courts have reviewed agency activity for abuse of discretion granted by even more generally worded statutes. *Cf. Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 375–86, 89 S.Ct. 1794, 1798–1804, 23 L.Ed.2d 371 (1969) (upholding fairness doctrine as consistent with FCC's duty to promote the "public convenience, interest, or necessity"); *FCC v. RCA Communications*, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (overturning FCC policy of granting licenses wherever competition is "reasonably feasible" as inconsistent with same mandate). In *Heckler v. Chaney*, the Supreme Court explicitly left open the possibility that the statute at issue there might permit review where "the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities," even though there were insufficient standards for review of particular decisions. 470 U.S. at 833 n. 4, 105 S.Ct. at 1657 n. 4 (quoting *Adams v. Richardson*, 480 F.2d at 1162). Of course, we do not mean to say that individual grant decisions are not reviewable under this statute—in appropriate cases they may be reviewable—but even if some, many, or all of them are not, nonetheless in the kind of "pattern or practice" case before us there

is "law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

Third, and perhaps most important, we do not believe that judicial review of this kind of claim threatens unwarranted interference with HUD's ability to carry out its basic statutory missions. This is so for the reasons stated in the last paragraph. The legal claim before us is not that, in the case of any particular decision, HUD must promote desegregation. Rather, the NAACP asks for review of a series of decisions to determine whether, taken together, they violate the obligation to further the goals of Title VIII. To make this determination does not threaten a large number of legal challenges or otherwise impair HUD's ability to make grants. *Cf. Hahn v. Gottlieb*, 430 F.2d at 1250 (citing impact of frequent review on FHA consideration of rent increases); *see also id.* at 1250 n. 6 (distinguishing review of approval of an urban renewal relocation scheme from review of approval of rent increases on the ground that the former involves only one-time, as opposed to repeated, review). We do not see how a one-time review of HUD's practices under an "abuse of discretion" standard can pose a serious threat to the agency's effectiveness.

Fourth, it does not seem impossible here for the court to develop an appropriate remedy. Of course, the court faces the difficult task of avoiding both remedies that may be too intrusive, interfering with HUD's ability to carry out its basic grant-awarding mission, and those that may prove to be ineffective. This difficulty is not, however, unsolvable. We do not see any reason why the court cannot effectively ensure HUD's future responsible exercise of discretion while at the same time preserving for the agency its discretionary options. *Cf., e.g., Louisiana v. United States*, 380 U.S. 145, 155–56, 85 S.Ct. 817, 823, 13 L.Ed.2d 709 (1965) (affirming order of monthly reports of voter registration as part of remedy for pattern of discrimination in registration). In formulating its remedy, of course, the district court may,

as it has already done, seek the advice and participation of HUD.

Just as we express no view now on the legal merits of the claims of violation, so we express no view on the remedies that may be appropriate. This task is to be undertaken by the district court in light of all the evidence, including any relevant events that may have occurred since the court rendered its initial decision. *See* 624 F.Supp. at 1092 (noting HUD's financing of Tent City and Columbia Point projects). We state simply that the problems of devising a remedy do not seem insurmountable to the point where a conclusion of nonreviewability is warranted.

In sum, we do not believe the legal claims raised here fall within the APA's exception for "action committed to agency discretion by law."

## V

### *Authority to Award Relief*

The government makes one final point. It says that HUD's actions here are unreviewable because they are "inaction." As HUD acknowledges, the APA empowers the courts to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). HUD argues, however, that this provision does not apply here, as the Secretary's duties under § 3608(e)(5) are discretionary and § 706(1) applies only to "mandatory" duties. *See Conservation Law Foundation v. Clark*, 590 F.Supp. 1467, 1472 (D.Mass.1984), *citing* 4 K. Davis, *Administrative Law Treatise* § 23.10, at 165 (1983).

■ HUD correctly points out that § 706(1) does not ordinarily empower a court to order an agency to fund particular projects or to reach particular results. *See NLRB v. Food Store Employees Local 347*, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974) (where court overrules agency's exercise of discretionary authority, it should ordinarily remand rather than amending order); *Silva v. Secretary of Labor*, 518 F.2d 301, 310–11 (1st Cir.1975) (declining to order certification as to which Secretary has "very substantial discretion" even though past denial of certification was

arbitrary and capricious). Nonetheless, a court "can compel an official to exercise his discretion where he has obviously failed or refused to do so." *Mastrapasqua v. Shaughnessy*, 180 F.2d 999, 1002 (2d Cir. 1950) (ordering INS to exercise statutory discretion with respect to petition for suspension of deportation order rather than arbitrarily denying petition); *see also Iowa v. Block*, 771 F.2d at 352 (court can enforce the "clear duty of the Secretary to promulgate regulations which carry out the intent of Congress"). To read § 706(1) as precluding such an order would be inconsistent with the need to provide a "hospitable interpretation" of the APA. *Abbott Laboratories v. Gardner*, 387 U.S. at 141, 87 S.Ct. at 1511.

■ Alternatively, the court may find authority to award relief under 5 U.S.C. § 706(2)(A), which empowers it to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." HUD argues that this provision is inapplicable because the NAACP does not seek to "set aside" any particular agency action. One can, however, reasonably view the NAACP's suit as one to "set aside" HUD's practice, which practice reflects an "abuse" of HUD's "discretion." This view is consistent with the statute. The APA defines "agency action" to include "failure to act." 5 U.S.C. § 551(13). The purpose of § 706(2)(A) is to provide for judicial review of agency action and inaction that falls outside its statutory powers. An interpretation of § 706(2)(A) that does not include an agency's "practice" within "action, findings, and conclusions," however, would prevent a court from setting aside those unlawful acts and practices that reveal themselves only over time—that emerge from a "pattern"—the very sort of unlawfulness that courts, for reasons stated earlier, often find themselves best suited to handle. Similarly, the words "set aside" need not be interpreted narrowly. A court, where it finds unlawful agency behavior, may tailor its remedy to the occasion. *See Indiana & Michigan Electric Co. v. FPC*, 502 F.2d

336, 346 (D.C.Cir.1974) ("[W]hile the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.") (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221 (1939)), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). On these facts, we are not sure what difference, if any, there may be between HUD's "failure to exercise" the discretion conferred upon it by § 3608(e)(5) and its "abuse" of that discretion as revealed in a pattern of HUD activity. We conclude that the court is empowered to order a remedy either for an act or a related omission of the sort here present.

*The decision of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.*