Colatta DEAN, et al.

v.

Mel MARTINEZ, et al.

No. CIV. CCB–03–1381.

United States District Court,
D. Maryland.

Sept. 21, 2004.

---

Gregory Leo Countess, Hannah E. M. Lieberman, Legal Aid Bureau Inc, Baltimore, MD, for Plaintiffs.

Allen F. Loucks, Office of the United States Attorney, David E. Ralph, Kurt A. Heinrich, Baltimore City Law Department, Baltimore, MD, for Defendants.

## MEMORANDUM

BLAKE, District Judge.

In this litigation, a group of former tenants are challenging plans to redevelop the Uplands Apartments, a 979–unit public housing project in Western Baltimore. The United States Department of Housing and Urban Development ("HUD") became the "Mortgagee in Possession" ("MIP") of the Uplands on January 1, 2001 and then acquired the property in a foreclosure sale on June 2, 2003. On about January 5, 2004, HUD sold the Uplands to the City of Baltimore for $10. The City plans to demolish the existing structures and replace them with a mix of market-rate and "affordable" housing—a plan that HUD not only authorized, but supported with a pledge of up to $36 million in grants. The plaintiffs allege that this disposition of the property was unlawful. Accordingly, they have sued HUD, HUD's Secretary, Mel Martinez, the Mayor of Baltimore, Baltimore's Department of Housing and Community Development ("DHCD"), and the DHCD's Commissioner, Paul Graziano.

This Memorandum addresses cross-motions for partial summary judgment with respect to the federal defendants, that is, HUD and HUD's Secretary (collectively, "HUD").[1] According to the plaintiffs, HUD committed several legal errors in disposing of the Uplands property: first, it failed to follow procedures mandated by the Multifamily Housing Property Disposition Act (the "Disposition Act"), 12 U.S.C. § 1701z–11 (Compl. Count 10); second, it imposed affordability criteria that failed to "further fair housing" as required by the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, 3608(e)(5) (Count 8); and third, it provided relocation services to ousted Uplands tenants that fell short of the requirements of the FHA (also Count 8) and the Uniform Relocation Act ("URA"), id. §§ 4601, 4625 (Counts 1 & 2). All these violations, the plaintiffs say, entitle them to relief under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702.[2] HUD seeks summary judgment on all these claims except insofar as the plaintiffs

---

1. The defendants have filed two motions for partial summary judgment, docket numbers 44 and 62. Two versions of the latter motion were previously filed in error (docket no. 59 & 60). The plaintiffs' motion for partial summary judgment is docket number 69. This Memorandum and Order will resolve all these motions.

2. The plaintiffs have stipulated that the APA is the only basis for jurisdiction over their claims. (See Pl.'s Opp'n at 6.)

allege that the relocation of tenants into "racially impacted areas" violated HUD's obligations. (*See* Def.'s Mot. for Summ. J., Proposed Order at 2.) The plaintiffs oppose HUD's motion and seek summary judgment for themselves on the Disposition Act claim. All the motions have been fully briefed and oral argument was heard September 17, 2004. For the reasons that follow, the court will grant in part and deny in part both parties' motions.

## BACKGROUND

Because this case is before the court in a summary judgment posture, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th Cir.2002); *see also* Fed.R.Civ.P. 56. There is also, however, an "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir.2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 525 (alteration in original) (quoting Fed. R.Civ.P. 56(e)).

Applying this standard to the record in this case, the facts appear as follows. HUD acquired control of the Uplands on January 1, 2001 when it became the MIP for the property. The property was in serious disrepair at the time; indeed, it was the previous owner's "failure to maintain the property in a decent, safe and sanitary condition" that caused HUD to declare a default and assume control of the property. (Iber Aff. ¶ 3, Def.'s Reply Ex. 41.) Faced with operations and maintenance costs exceeding $343,000 per month (*see id.* ¶¶ 3, 12), HUD hired a contractor to conduct a "Comprehensive Repair Survey," which determined that rehabilitating the property to HUD's standards would cost approximately $30 million (*id.* ¶¶ 3–4). Accordingly, HUD began to explore the option of relocating the Uplands tenants and disposing of the property. Because the Disposition Act gives state and local governments a 90–day right of first refusal in any sale of a multifamily housing project acquired by HUD, *see* 12 U.S.C. § 1701z–11(i), HUD gave notice to state and city officials on September 13, 2001 that it intended to foreclose on the Uplands property. (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 21.)

Though HUD maintains that it worked to "establish lines of communication with tenants" even before it became the MIP, the earliest notices of a possible tenant relocation in the record are dated November 7–8, 2001. (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 1–2.) These notices advised tenants that HUD was planning a foreclosure "within the next few months." The notices also assured tenants that the property would be "maintained as affordable housing for 20 years," that eligible tenants would receive Section 8 housing vouchers, and that HUD would provide relocation services in the event repairs by the new owner required tenants to move. The notices provided a contact number for tenants wishing to ask questions or "provide input." On November 29, 2001, the City of Baltimore informed HUD that it was interested in acquiring the Uplands. (Pl.'s Opp'n Ex. 4.)

On February 11, 2002, HUD notified the Uplands tenants that it had "decided to

relocate the residents of the complex in the near future." (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 3.) "This is being done," the notice explained, "to safeguard the health, safety and security of the residents." The notice again explained that HUD would provide housing vouchers to eligible tenants and "relocation benefits to aid in [the tenants'] search for suitable housing and for the moving process." On February 28, 2002, representatives of HUD and the HUD contractor managing the Uplands held meetings with tenants to provide information about the relocation. (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 4.) The contractor then followed up on March 1, 2002 with a newsletter providing more detailed information, including answers to "frequently asked questions." (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 5.) Another meeting was held on May 20, 2002 (see Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 9), and on June 25, 2002, representatives from apartment complexes with vacancies attended a housing fair at the Uplands relocation office (see Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 7). Though HUD had initially set a deadline of September 1, 2002 for tenants to vacate the property, HUD extended the deadline and held yet another meeting for remaining tenants on September 23, 2002. (See Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 8.) In "urgent notice[s]" dated October 18, 2002, November 18, 2002, and January 23, 2003, HUD advised tenants that foreclosure was expected in January 2003 or the "Winter–Spring of 2003" and that relocation services would not be available following the foreclosure. (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 9, 10, 13.)

On June 2, 2003, HUD finally conducted the foreclosure sale and, having unsuccessfully sought other buyers, acquired ownership of the property. The plaintiffs had sought a preliminary injunction to prevent the sale, but on May 30, 2003 I denied the motion. (Tr. of Hr'g on 5/30/2003, docket no. 57.) On June 26, 2003, HUD issued an "Initial Disposition Plan" indicating that HUD planned to sell the Uplands to the City for $10 and provide grant assistance to facilitate the redevelopment of the property. (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 17.) The Plan stipulated that for 25 years the City would be required to maintain at least 74% of the redeveloped units as "affordable" housing, which the Plan defined as housing for families earning no more than 80% of the area median income. The remaining 26% could be sold or rented at market rates, and up to 31% of the affordable units could be targeted at families earning up to 115% of the area median income. Former Uplands tenants were to be given first option on the new units, and the new development was to be barred from discriminating against holders of Section 8 vouchers. "Due to the poor and deteriorated condition of the properties," the Plan observed, "HUD began relocation of all residents in February 2002." Responsibility for relocating the "small number of families" still on the property would shift to the City when the property was sold.

It appears HUD distributed the Plan to all remaining Uplands tenants with a cover letter indicating that comments could be sent to HUD for thirty days after June 26, 2003. (See id.) HUD did not, however, instruct tenants that the full disposition recommendation, analysis, and supporting documentation was available for inspection and copying, as the plaintiffs argue HUD was required to do under 24 C.F.R. § 290.11(d). (Pl.'s Opp'n at 8.) The address for sending comments was also incomplete in the body of the letter, though the full address was printed on the letterhead. In addition to comments from individual tenants, HUD received a nine-page letter from the Uplands Apartments Ten-

ant Association ("UATA") criticizing, among other things, the Plan's affordability standards and the decision to demolish rather than repair the Uplands. (Pl.'s Opp'n Ex. 1.) The UATA expressed concern that a "significant number of residents" had relocated to "replacement housing that is not habitable," and that the right of return guaranteed by the Plan would prove "illusory" for most Uplands tenants unless the affordability standard were lowered to 50% or less of the area median income. Apparently responding to the concern that it had failed to provide access to the record supporting its decision, HUD later reopened the comment period regarding the Plan. The UATA reiterated its concerns in a new submission incorporating the earlier comments. (Pl.'s Opp'n Ex. 2.)

HUD sold the Uplands property to the City on about January 5, 2004. The "Final Disposition Plan" was identical in all material respects to the Initial Disposition Plan; it made no reference to the tenant comments. (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 26.) Immediately after the sale, the DHCD condemned the Uplands as unsafe for habitation and posted notices directing tenants to vacate the premises by January 16, 2004. Though the City extended the deadline to accommodate residents who had been unable to find suitable housing, the last of the tenants left on March 19, 2004 and it appears the Uplands are now vacant. The City is working to finalize its plans for the property; it expects to solicit redevelopment proposals in the fall of 2004 and to select a developer by the end of the year. (See Baltimore City's Mem. in Supp. of Mot. to Dismiss at 4, docket no. 96.) Demolition has yet to be scheduled.

## ANALYSIS

The Administrative Procedure Act ("APA") provides a cause of action for adversely affected parties to seek judicial review of agency decisions. See 5 U.S.C. § 702. Arguing that HUD's disposition of the Uplands property was a reviewable "final agency action" under the APA, see id. § 704, the plaintiffs urge the court to set aside HUD's action for three reasons: first, because HUD disregarded the procedural requirements of the Disposition Act; second, because it breached its duty to further fair housing; and third, because its relocation services to Uplands tenants were inadequate under the FHA and URA. The first of these claims, according to the plaintiffs, is sufficiently clear to permit summary judgment in their favor. HUD argues to the contrary that the record fails to indicate a basis for success on any of the plaintiffs' claims; the sole "live issue," according to HUD, is "whether the relocation forced tenants to move into more severely impacted areas of Baltimore and whether such is even actionable." (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. at 3.)[3] I will address each of the plaintiffs' three claims in turn.

### I.

The Disposition Act, the source of the plaintiffs' first APA challenge, regulates the sale of multifamily housing projects owned by HUD. Before such property may be sold, HUD's Secretary must "develop an initial disposition plan for the project that specifies the minimum terms and conditions of the Secretary for disposition of the project, the initial sales price that is acceptable to the Secretary, and the assistance that the Secretary plans to make available to a prospective purchaser in accordance with this section." 12 U.S.C.

---

**3.** HUD's formulation of the "live issue" is somewhat confusing because whether the plaintiffs' allegations are "actionable" would seem to be an issue of law that could be resolved by motion.

§ 1701z–11(c)(2)(A); *see also* 24 C.F.R. § 290.15. When the Secretary undertakes a "proposed disposition" of a multifamily housing project owned by HUD, tenants must be given "an opportunity to comment" on the proposal and the Secretary must take the comments "into consideration." 12 U.S.C. § 1715z–1b(b)(1). In addition, the Secretary must dispose of the property in a manner that "will, in the least costly fashion among reasonable available alternatives, address" the following eight "goals":

 (A) preserving certain housing so that it can remain available to and affordable by low-income persons;

 (B) preserving and revitalizing residential neighborhoods;

 (C) maintaining existing housing stock in a decent, safe, and sanitary condition;

 (D) minimizing the involuntary displacement of tenants;

 (E) maintaining housing for the purpose of providing rental housing, cooperative housing, and homeownership opportunities for low-income persons;

 (F) minimizing the need to demolish multifamily housing projects;

 (G) supporting fair housing strategies; and

 (H) disposing of [multifamily housing projects owned by HUD] in a manner consistent with local housing market conditions.

*Id.* § 1701z–11(a)(3). The plaintiffs argue that summary judgment is appropriate because HUD considered neither the tenants' comments nor the statutory factors before disposing of the Uplands property. HUD disagrees and argues for summary judgment in its favor on this count.

 Both parties appear to agree that HUD's disposition of the Uplands property may be set aside only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is highly deferential. So long as HUD "considered the relevant data and articulated an explanation establishing a 'rational connection between the facts found and the choice made,'" *Frisby v. HUD,* 755 F.2d 1052, 1055 (3d Cir.1985) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)), HUD's action must be upheld. HUD, moreover, is entitled to a "presumption of regularity," and the party challenging the action bears the burden of establishing a violation. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Nevertheless, if, as the plaintiffs allege, "the agency relied on factors Congress did not intend for it to consider, or has failed to consider an important aspect of the problem, then the action should be set aside as arbitrary and capricious." *Frisby,* 755 F.2d at 1055 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

 In light of this deferential standard of review and the "presumption of regularity," HUD's treatment of the tenant comments appears consistent with the Disposition Act. An explicit response to the tenants' concerns, while perhaps desirable, was not required by the statute; HUD's only obligation was to take tenant comments "into consideration." 12 U.S.C. § 1715z–1b(b)(1). Uncontradicted evidence in the record indicates that HUD discharged this responsibility. First, HUD not only solicited tenant comments, but extended the submission deadline in response to UATA concerns. Once it had received comments, HUD prepared a summary of tenant concerns.[4] (Def.'s Re-

---

4. How, if at all, HUD used the summary is not clear.

ply Ex. 39.) In addition, though HUD did not respond to the tenant comments in the final disposition plan, an internal memorandum dated December 17, 2003 states that tenant comments were received and "considered in arriving at the final disposition plan" (Pl.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1 at 63), and a declaration by the Director of HUD's Multifamily Program Center indicates that HUD staff reviewed the comments but determined that no changes to the Initial Disposition Plan were appropriate (Iber Aff. ¶¶ 7, 11, 13–15). Though, again, an explicit response to the tenants' comments would have made a stronger case for upholding HUD's decision, this evidence is sufficient to prevent a finding that HUD ignored tenant concerns in breach of its statutory obligations. *Cf. Project B.A.S.I.C. v. Kemp,* 721 F.Supp. 1501, 1512 (D.R.I. 1989) (holding that a public housing authority acted based on "consultation" with tenants where the record "indicate[d] some effort to gain input from tenants," though the agency "solicited very little of the input it received" and incorporated none of the tenant comments into its decision). Accordingly, HUD's motion will be granted with respect to this challenge.

■ By contrast, the record does not support HUD's assertion that it considered the Disposition Act's goals. While HUD's brief suggests that HUD's action was consistent with the statutory criteria, the only justification indicated by the disposition plans or any other documents in the record is the cost of maintaining and repairing the property. "An analysis of the repair needs, including the need to replace malfunctioning and obsolete infrastructure, and the cost of operating the properties," the plans explain, "led to the conclusion

that it was not economically feasible to repair the properties . . . ." (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. Ex. 17, 26.) Such cost concerns, while relevant in light of the statute's command that HUD act "in the least costly fashion among reasonable available alternatives," 12 U.S.C. § 1701z–11(a)(3), may not by themselves justify HUD's action. HUD, rather, was obligated to determine that the cost of maintaining and rehabilitating the property "outweigh[ed] other goals expressed in the statute." *Cowherd v. HUD,* 827 F.2d 40, 43–44 (7th Cir.1987); *see also Frisby,* 755 F.2d at 1057 (noting that HUD's Secretary must consider the Disposition Act goals but that "[i]f the Secretary makes a reasonable determination that furtherance of one (or more) objective is not feasible in a given instance, then the Secretary is under no duty to act only in a manner which will also further that objective"). Because there is no evidence to suggest that HUD attempted such a weighing of competing statutory considerations, the only reasonable interpretation of the record is that HUD's action was arbitrary and capricious.[5]

■ The record is even more sparse with respect to the affordability standards HUD imposed in its contract with Baltimore City. Robert Iber, the Director of HUD's Multifamily Program Center, indicates in an affidavit that HUD normally requires that redevelopments of formerly subsidized properties result in 85% affordable housing and 15% market rate housing. (Iber Aff. ¶ 6.) He states, however, that the City "requested that HUD change its requirement to 20% affordable and 80% market rate." (*Id.*) Why HUD ultimately concluded that a mix of 74% affordable and

---

**5.** HUD's failure to document consideration of the Disposition Act goals is particularly striking in light of my explicit discussion of these very same factors during the May 29–30, 2003 hearing on the plaintiffs' motion for a preliminary injunction. (*See* Tr. of Hr'g on 5/30/03 at 63–65.)

26% market rate housing was appropriate is nowhere substantiated in the record: while Mr. Iber indicates that the decision was based on a "review of the market and affordability criteria offered on similar properties across the country," the review itself is not included as an exhibit and Mr. Iber offers no details about the analysis. (*See id.*) Nor is it apparent why HUD set an "affordability" standard based on 80% of the regional median income—a figure the plaintiffs maintain is too high to permit former Uplands tenants to return to the property following the planned reconstruction. Again, Mr. Iber's affidavit attempts to remedy this defect: he indicates that "HUD staff surveyed the local rental market" and concluded that market rates in the area were "within the voucher payment standard." (*Id.* ¶ 8.) Yet the only evidence substantiating this assertion is a one-page survey of local rental rates with handwritten comments, and that document fails even to indicate what the voucher payment standard is, much less what methodology the author followed to derive the handwritten "conclusion" that "all or nearly all apartments" were affordable. Nor is there any comparison provided between the physical condition and facilities of the listed apartments and what might be expected at a rebuilt Uplands. (Def.'s Reply Ex. 40.)[6] Moreover, even assuming the survey is accurate, Mr. Iber's reasoning—that "[a]ny rental property built on the site, no matter what the income requirements, would have to have rents affordable on the market" (Iber Aff. ¶ 8)— fails to support HUD's action, for by that logic there was no need even to require that 26% of the housing be affordable; market forces, it seems, would necessarily have made it so. These deficiencies in the record, again, prevent the court from con-

cluding that HUD exercised its discretion appropriately in light of the Disposition Act's goals.

▮ Recognizing, perhaps, the weakness of its argument on the merits, HUD argues on several grounds that the court lacks jurisdiction to consider the affordability standards. First, HUD argues that the plaintiffs lack standing under Article III of the United States Constitution because their injury due to the affordability standards is speculative. Article III, as HUD correctly notes, requires the plaintiff to demonstrate (1) an injury in fact, (2) fairly traceable to the defendant's action, and (3) redressable by the requested relief. *See, e.g., Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 517 (4th Cir. 2003). Whereas the plaintiffs maintain that many, if not all, of the redeveloped units will be unaffordable for relocated Uplands tenants, HUD argues that the plaintiffs have shown no redressable injury with respect to the affordability criteria because it remains uncertain what affordability standards Baltimore City will ultimately impose and whether the plaintiffs will in fact be able to meet them. HUD's argument is flawed because it artificially separates the affordability criteria from other aspects of HUD's disposition of the property. Had HUD set different requirements, the City might have bargained for other terms in exchange, or even backed away from the deal entirely; indeed, it is clear from the record that the City pressured HUD to allow at least 20% of the redeveloped property to consist of market rate housing. Had the deal fallen through or taken place on other terms, the plaintiffs' apartments might have been repaired or renovated instead of demolished, in which case the plaintiffs might have been

---

**6.** One of the handwritten comments states, "These are nonweighted averages," but it is unclear what was being averaged.

able to remain in their apartments or at least return to them after the repairs. In any event, HUD's action has displaced the plaintiffs at least temporarily from their homes, resulting in at least some cases in increased commuting costs and other inconveniences. Such costs are sufficient to establish injury-in-fact.[7] Because the affordability standards were an integral component of the agency action that caused that injury, and because the injury is traceable to HUD and remediable by reconsideration of HUD's decision, the plaintiffs have standing under Article III.

HUD also draws an analogy to *McGrath v. HUD*, 722 F.Supp. 902 (D.Mass.1989), and other similar cases holding that tenants lack standing to enforce provisions of compliance agreements between HUD and local housing authorities. *See id.* at 905–06; *see also Perry v. Housing Auth. of City of Charleston*, 664 F.2d 1210, 1218 (4th Cir.1981). These cases, however, are distinguishable. In this case, the plaintiffs are not seeking to enforce the terms of HUD's agreement with Baltimore City, but rather to establish that HUD should not have entered the agreement in the first place. Because, again, HUD's action caused the plaintiffs harm, the fact that they were not parties to the agreement that effectuated HUD's decision is no bar to the plaintiffs' suit.

■ Finally, HUD suggests that even if the plaintiffs have standing, their claims are not ripe because the extent of their injury will remain uncertain until the City settles on a redevelopment plan. Only at that time, HUD argues, will it be clear what the actual affordability standards will be and whether the former tenants will in fact be unable to return. This argument is flawed because the ripeness inquiry requires the court to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration," *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *see also W. Va. Highlands Conservancy, Inc. v. Babbitt*, 161 F.3d 797, 800 (4th Cir.1998), and neither of those factors supports postponing review in this case. First, the question whether HUD's disposition of the Uplands was lawful is fit for review because HUD's action with respect to the property is complete. Given that the plaintiffs have suffered an injury sufficient to confer standing, the full extent of that injury is irrelevant to the claim against HUD.[8] Second, postponing review of the issue could cause extreme hardship, if not to HUD and the plaintiffs, then certainly to Baltimore City and the DHCD, which may not wish to proceed with their plans for the Uplands until the legality of HUD's transfer of the property to them is established. Accordingly, the court will decline to defer consideration of the plaintiffs' claims on ripeness grounds.

The court, then, has jurisdiction under the APA to hear the challenge to HUD's adherence to the Disposition Act's goals, and the only possible conclusion based on the present record is that the challenge may succeed. Accordingly, I will grant this aspect of the plaintiffs' motion for summary judgment and remand the case to HUD for reconsideration of its decision

7. The plaintiffs' allegation, discussed elsewhere in this Memorandum, that HUD's action will compel them to live in areas of higher minority concentration might also cause an injury sufficient to confer standing. *See Glendale Neighborhood Ass'n v. Greensboro Housing Auth.*, 956 F.Supp. 1270, 1274 (M.D.N.C.1996) (finding standing where the plaintiffs alleged that the construction of a proposed housing project in their neighborhood would lead to higher minority concentration, "caus[ing] or worsen[ing] segregation of that neighborhood").

8. The APA is an equitable measure, so there is no question as to the amount of damages.

in light of the Disposition Act's enumerated objectives. It bears emphasis that on remand HUD will retain "broad discretion to choose between alternative methods of achieving the national housing objectives," *Shannon v. HUD*, 436 F.2d 809, 819 (3d Cir.1970); HUD may even choose to reinstate its prior disposition if full consideration of the statutory factors leads it to that conclusion. *See Frisby*, 755 F.2d at 1057 ("[A]lthough the Secretary is required to consider all the objectives set forth in the statute, there is, of course, no requirement that the specific course of action taken by the Secretary in fact further all those objectives."). HUD's discretion, however, "must be exercised within the framework of the national policy against discrimination in federally assisted housing, and in favor of fair housing." *Shannon*, 436 F.2d at 819. (citations omitted).

## II.

■ The plaintiffs' second APA claim relates to HUD's duty "affirmatively to further," 42 U.S.C. § 3608(e)(5), the FHA's policy of "provid[ing], within constitutional limitations, for fair housing throughout the United States," *id.* § 3601. This duty obligates HUD to do more than simply refrain from discriminating; HUD must take active steps to ensure fair housing. *See, e.g., Darst–Webbe Tenant Ass'n Bd. v. St. Louis Housing Auth.*, 339 F.3d 702, 713–714 (8th Cir.2003); *NAACP v. HUD*, 817 F.2d 149, 154–55 (1st Cir.1987). The plaintiffs argue that HUD breached this obligation because there is no evidence to suggest that the agency considered the fair housing implications of its disposition of the Uplands. In fact, the plaintiffs suggest, HUD's action did not further fair housing because the affordability standards HUD authorized will permit Baltimore City to charge rents on the redeveloped property that will likely be unaffordable for many former Uplands tenants. The effect, the plaintiffs say, will be to shunt the tenants, most of whom are African–American, into poor neighborhoods with high minority concentrations, contravening HUD's duty to promote housing integration.

As an initial matter, HUD again challenges the court's jurisdiction to hear the plaintiffs' claims. With respect to the FHA, HUD argues, in addition to the arguments discussed above, that the APA does not permit a challenge to HUD's agreement with the City because the plaintiffs' FHA claim against the City affords them an adequate remedy at law for the same alleged injury. HUD bases this theory on cases denying APA review of agency enforcement decisions where claims directly against the violator could remedy the plaintiff's alleged injury. *See, e.g., N.Y. City Employees' Retirement Sys. v. SEC*, 45 F.3d 7, 14 (2d Cir.1995); *Gillis v. HHS*, 759 F.2d 565, 575 (6th Cir.1985); *Council of & for the Blind of Del. County Valley, Inc. v. Regan*, 709 F.2d 1521, 1531–32 (D.C.Cir.1983); *Marinoff v. HUD*, 892 F.Supp. 493, 497 (S.D.N.Y.1995). These cases are distinguishable. In this case, the plaintiffs' claim is based on HUD's own action—the decision to sell the Uplands—not the action of a regulated entity. Moreover, the City's duties under the FHA are not coextensive with HUD's: as I indicated—and as the plaintiffs themselves argue—HUD's duty to further fair housing goes beyond the obligation to avoid discrimination imposed by the FHA on regulated entities such as the City. Because APA review of HUD's FHA compliance thus addresses a different harm from the plaintiffs' claims against the City, I will join other courts in concluding that such claims are within the court's jurisdiction. *See, e.g., Darst–Webbe Tenant Ass'n Bd.*, 339 F.3d at 713–14; *NAACP v. HUD*, 817 F.2d at 157–160.

On the merits, to the extent the plaintiffs' claim is that HUD failed to give adequate consideration to fair housing policies in disposing of the Uplands property, HUD's motion for summary judgment will be denied for the reasons discussed above in connection with the Disposition Act claim. As I noted earlier, the record in this case is devoid of any indication as to what basis, if any, HUD had for imposing the particular affordability criteria it chose. In particular, there is no evidence to suggest that HUD considered the impact of the City's redevelopment plans on the racial composition of the Uplands area and other neighborhoods—something HUD was obliged to consider not only as a matter of its "affirmative[ ]" duty under § 3608(e)(5), but also because "supporting fair housing strategies" is a specified goal under the Disposition Act, see 12 U.S.C. § 1701z–11(a)(3)(G). Without such evidence, there is at least a material issue of fact as to whether the agency fulfilled its statutory obligation to further fair housing policies.[9]

Because I will deny HUD's motion for summary judgment on this basis, I will not rule at this time on the merits of the plaintiffs' broader suggestion that "[t]he affordability requirements in the contract HUD selected for the disposition of the property do not further fair housing." (Pl.'s Opp'n at 24.) Though it is true, as I noted earlier, that several courts have permitted APA review of HUD's compliance with fair housing policies, these courts have often limited their holdings to situations involving a "pattern" of misconduct on HUD's part—something the plaintiffs have not alleged here. See, e.g., NAACP v. HUD, 817 F.2d at 158; Vaughn v. Consumer Home Mortgage, Inc., 293 F.Supp.2d 206, 211–12 (E.D.N.Y.2003). In fact, in the leading case adopting this theory, the First Circuit expressly reserved the question the plaintiffs' theory would require the court to answer: whether "a court can fashion standards governing when, or the extent to which, HUD should use an *individual* grant decision affirmatively to bring about desegregation." NAACP v. HUD, 817 F.2d at 158 (emphasis in original). Given this uncertainty in the precedents, I will base the denial of HUD's motion solely on the agency's failure to consider the fair housing implications of its decision. HUD will have the opportunity to reconsider the fair housing issues due to my remand of the Disposition Act claim, and I will reserve the right to revisit the plaintiffs' arguments after HUD has had the opportunity to offer a more complete explanation of its action.

### III.

The plaintiffs' final claim challenges the relocation services provided to the Uplands tenants. According to the plaintiffs, HUD's efforts to relocate the Uplands tenants to alternative housing fell short of HUD's obligations under both the FHA and the URA. Of these two theories, only the URA claim requires detailed consideration at present, as HUD does not appear to seek summary judgment with respect to the fair housing implications of its relocation efforts. (See Def.'s Mem. in Supp. of Mot. for Partial Summ. J. at 3 (describing whether the relocation forced tenants to move into more severely impacted areas of

---

9. Again, it seems HUD could have anticipated this issue based on my comments during the preliminary injunction hearing. See supra note 5. At the hearing, I described the fair housing factor as "the element as to which there is the least clarity in the record." (Tr. of Hr'g on 5/30/03 at 64–65.) I also commented, "[I]t is troubling both under the Disposition Act and particularly under the Fair Housing Act that the racial impact of the bid package appears not to have been considered. It is not clear that the impact of the relocation was considered." (Id. at 65.)

Baltimore and whether such is even actionable" as a "live issue").) In any event, as concerns the FHA, the plaintiffs' challenge to the relocation efforts largely parallels their challenge to the Uplands disposition as a whole: once again, the plaintiffs argue that the transfer of tenants from the Uplands to areas of greater minority concentration was inconsistent with HUD's obligation to further fair housing under 42 U.S.C. § 3608(e)(5). It makes sense, therefore, to defer review of the relocation claim until after HUD has reconsidered the fair housing implications of its overall disposition of the property.

 As to the URA, the plaintiffs argue that HUD's efforts fell short of its statutory obligation to assist displaced tenants. The record, however, fails to substantiate this claim. The URA and associated regulations require that HUD, among other things, determine the needs and preferences of displaced persons with respect to relocation assistance, 42 U.S.C. § 4625(c)(1); *see also* 49 C.F.R. § 24.205(c)(2)(i), assist displaced individuals with moving expenses, 42 U.S.C. § 4622, provide information about the availability and costs of "comparable replacement dwellings," *id.* § 4625(c)(2); *see also* 49 C.F.R. § 24.205(c)(2)(ii), and "assure that a person shall not be required to move from a dwelling unless the person has had a reasonable opportunity to relocate to a comparable replacement dwelling," 42 U.S.C. § 4625(c)(3).[10] The statute defines "comparable replacement dwelling" as follows:

> The term 'comparable replacement dwelling' means any dwelling that is (A) decent, safe, and sanitary; (B) adequate in size to accommodate the occupants; (C) within the financial means of the displaced person; (D) functionally equivalent; (E) in an area not subject to

unreasonable adverse environmental conditions; and (F) in a location generally not less desirable than the location of the displaced person's dwelling with respect to public utilities, facilities, services, and the displaced person's place of employment.

*Id.* § 4601(10). In the event that housing meeting this standard is "not available," "the head of the displacing agency [HUD in this case] may take such action as is necessary or appropriate to provide such dwellings by use of funds authorized for [the project causing the displacement]." *Id.* § 4626(a). "No person," however, "shall be required to move from his dwelling on account of any program or project undertaken by a Federal agency or with Federal financial assistance, unless the head of the displacing agency is satisfied that comparable replacement housing is available to such person." *Id.* § 4626(b).

Citing the affidavits of several dissatisfied tenants, the plaintiffs argue that HUD failed to discharge these URA obligations. In particular, they contend that HUD failed to locate "comparable replacement dwellings" for at least some tenants. For instance, Katrina Minor, one of the plaintiffs in this case, states in an affidavit that information in a list given to her by the Uplands relocation office was "old"; many of the listed options, she says, did not accept section 8 vouchers or had already met their section 8 quota. (Def.'s Reply Ex. 28.) After an apartment in Strawberry Hill fell through, apparently at the fault of officials in either Baltimore City or Baltimore County, Ms. Minor settled on an apartment in the Cherry Hill area, which she says is much less convenient than the Uplands in terms of shopping and transportation. Whereas she could walk to work in the Uplands, Ms. Minor now

---

**10.** The parties do not appear to dispute that the Uplands tenants are "displaced persons" under the statute. The URA definition of that term is provided in 42 U.S.C. § 4601(6).

spends $30 per week on transportation and must awake at 5:00 am to get herself to work and her granddaughter to school. Another plaintiff, Daisy Robinson, complains that she, too, was forced to move to Cherry Hill and substitute a long bus ride to work and school for the short walks she and her son enjoyed in the Uplands. (Def.'s Reply Ex. 29.) She describes her new apartment as "much worse"; she says she now has no air conditioning and poor ventilation, which is problematic for her asthmatic son, and she also worries about crime in her new neighborhood. Much like Ms. Minor, Ms. Robinson found housing initially in a better location but lost the apartment when a Baltimore City official failed to place a necessary phone call. A third plaintiff, Ralph Jefferson, says that the Uplands were conveniently located close to grocery stores and to his 80–year–old mother's doctor, whom she must visit frequently. (Def.'s Reply Ex. 30.) His new apartment has "problems that must be fixed" and "a lot of steps," which may be troublesome for his mother, but he accepted it for fear of being homeless. For these tenants, the plaintiffs argue, HUD's relocation services failed to locate housing comparable to the Uplands.

HUD responds that its efforts to relocate the hundreds of tenants living in the Uplands as of January 2001 should not be judged by the complaints of a few disgruntled affiants.[11] HUD and its contractor sent repeated notices of available services to tenants beginning in late 2001, and meetings with tenants were held on several occasions. Depositions of former Uplands tenants indicate that relocation staff were available for individualized discussions of tenant needs and housing options. (*See, e.g.,* Jones Dep. at 10, Def.'s Reply Ex. 32; Dean Dep. at 14–15, Def.'s Reply

Ex. 35.) HUD maintains, moreover, that it had no obligation to ensure that all tenants actually received housing meeting all their needs and preferences; the agency's duty was simply to assure a "reasonable opportunity" to do so. HUD argues that it has met this obligation.

Although there appears to be little case law addressing the issues raised by the parties, several controlling principles emerge from the few relevant cases, the applicable regulations, and the URA itself. First, it is clear that even if the plaintiffs' URA claim seeks to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), the scope of review of this challenge is defined by the "arbitrary" and "capricious" standard of 5 U.S.C. § 706(2)(A). Other courts have so held, *see, e.g., Supreme Oil Co. v. Metro. Transp. Auth.,* 157 F.3d 148, 151 (2d Cir. 1998) (collecting cases), and HUD points to no authority for a different standard, nor even clearly articulates what standard it believes should apply. This standard, once again, requires the agency to present an adequate explanation for its actions, but is otherwise highly deferential.

Second, HUD is correct that the URA does not require it to provide relocation assistance to tenants who were informed of available services but chose not to make use of them. At least one federal court reached this conclusion in a URA case, *see Boston v. United States,* 424 F.Supp. 259, 267 (E.D.Mo.1976), and this view is most consistent with language in the statute indicating that the agency's obligation is to "ensure that the [prescribed] relocation assistance advisory services ... are *made available,*" as opposed to affirmatively provided. *See* 42 U.S.C. § 4625(b) (emphasis added). Along similar lines, even when

---

11. HUD states that 642 units were occupied at the Uplands in January 2001, whereas only 26 families remained by the time the plaintiffs filed their initial Complaint in May 2003. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 12–13.)

tenants seek assistance, HUD is not necessarily in breach of its obligations if some displaced tenants fail to end up in comparable housing; the agency's duty, rather, is discharged so long as the tenants were given a "reasonable opportunity" to locate such housing themselves. *Id.* § 4625(c)(3).

Finally, it bears emphasis that HUD's obligation is not—and could not possibly be—to identify housing opportunities for displaced tenants that are equivalent in all respects with the housing the tenants have lost. Recognizing that different properties in the housing market can never be completely fungible, the URA requires only comparability, not equivalence, as between the prior apartment and the replacement housing. Moreover, the statute defines a property as "comparable" if it is *"functionally* equivalent" and *"generally* not less desirable" as to location—terms that leave HUD discretion to consider the practical realities of the housing market in determining appropriate relocation sites for displaced tenants. *Id.* § 4601(10) (emphasis added). Consistent with this flexible language, at least one court has noted that the URA entails no requirement that the comparable housing be located in the "immediate neighborhood," *see Mejia v. HUD,* 518 F.Supp. 935, 938–939 (N.D.Ill.1981), *aff'd,* 688 F.2d 529 (7th Cir.1982). Any other interpretation would carry the unreasonable implication that HUD could not demolish or substantially refurbish a large housing project such as the Uplands if the alternative housing in close proximity were insufficient to absorb the displaced tenant population.

In light of these principles, the plaintiffs have failed to establish that HUD's relocation efforts in this case were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" due to violations of the URA. HUD provided notice to the tenants of the available services, as it was required to do, and it appears that the Uplands relocation staff invested substantial effort in assisting tenants who took advantage of its. services. Of the hundreds of relocated tenants, the plaintiffs have presented evidence of dissatisfaction on the part of only a handful, and even these tenants' complaints do not appear so substantial as to indicate an abuse of discretion on HUD's part. Indeed, the chief complaint of the dissatisfied tenants appears to be the location of the new housing: Ms. Minor, Ms. Robinson, and Mr. Jefferson all state that the Uplands was closer to their jobs and other necessities. Yet, as I noted earlier, the URA did not require HUD to relocate tenants to housing in the immediate vicinity, particularly if none was reasonably available. *See Mejia,* 518 F.Supp. at 938–39. Furthermore, Ms. Minor and Ms. Robinson had, in fact, found housing in more desirable locations but lost it due to mistakes by local officials; Mr. Jefferson, similarly, though pointed to Cherry Hill by relocation staff, found a better location when he continued looking. These successes indicate that the tenants had a "reasonable opportunity" to obtain housing in preferable locations, even if some of them ultimately ended up in less convenient apartments due to local government errors beyond HUD's control.[12]

Thus, given the presumption of regularity in HUD's favor and the deferential standard of review, the present record does not establish that HUD failed to discharge its responsibilities to provide bene-

---

**12.** Though this point is not directly relevant to the URA analysis, it goes without saying that the apartments the tenants were leaving were hardly unproblematic. The grave disrepair at the Uplands raises a serious question as to whether the Uplands apartments were themselves "decent, safe, and sanitary," as the URA would require of any housing to which tenants were moved.

fits under the URA. Accordingly, judgment will be entered as to the plaintiffs' claim based on this theory.

## IV.

In sum, I will grant HUD's motion for partial summary judgment with respect to the plaintiffs' claim that HUD failed to consider tenant comments in disposing of the Uplands (count 10) and with respect to the plaintiffs' URA-based claims (counts 1 & 2), except to the extent those claims are based on an alleged failure to provide assistance consistent with fair housing requirements.[13] As to the claim that HUD failed to consider factors specified by the Disposition Act (also count 10), I will grant the plaintiffs' motion for summary judgment and remand the issue to HUD for fuller consideration. Finally, I will deny HUD's motion in all other respects, deferring consideration of the FHA issues until after the remand.

While my remand of the Disposition Act claim could permit me to "set aside" HUD's disposition of the Uplands, 5 U.S.C. § 706(2), I will not take that step at this time. Such a measure would be imprudent considering that HUD may yet succeed in justifying its action, and nullification of the sale agreement in the meantime could cause substantial hardship to the City. Accordingly, I will order a remand without vacating the agency's action. HUD's disposition of the Uplands will remain in effect for the time being. I also will refer the parties to further discussions with Judge Paul Grimm and require a status report in 30 days.

A separate Order follows.

13. At the hearing, counsel disagreed whether the URA covered this aspect of the plaintiffs' claims. As it appears essentially similar to

## ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the plaintiffs' Motion for Partial Summary Judgment (docket no. 69) is **GRANTED IN PART AND DENIED IN PART** as stated in the accompanying Memorandum;

2. the defendants' Motions for Partial Summary Judgment (docket no. 44 and 62) are **GRANTED IN PART AND DENIED IN PART** as stated in the accompanying Memorandum;

3. the case is referred to Judge Paul W. Grimm for development of a discovery plan, if needed, and for mediation;

4. a joint status report is due **October 22, 2004;** and

5. copies of this Order and the accompanying Memorandum shall be sent to counsel of record.

aspects of the FHA and Disposition Act issues remaining in the case, I need not presently resolve this disagreement.